IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LINDA PETRULIO**<br>**Chester Springs, PA** | : | **CIVIL ACTION NO.** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **TELEFLEX INCORPORATED**<br>**155 South Limerick Road**<br>**Limerick, PA 19468** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **and** | : | |
| | : | |
| **TELEFLEX MEDICAL**<br>**INCORPORATED**<br>**155 South Limerick Road**<br>**Limerick, PA 19468** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## COMPLAINT

I.    **INTRODUCTION**

Plaintiff, Linda Petrulio, brings this action against her former employers,

Teleflex Incorporated and Teleflex Medical Incorporated (together "Defendants").

During her employment with Defendants, Plaintiff was discriminated against

because of her sex, and retaliated against based on her complaints about the

same, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000e, *et seq.* ("Title VII") and the Pennsylvania Human Relations Act,

as amended, 43 P.S. §951, *et seq.* ("PHRA").

II.     **PARTIES**

1.      Plaintiff, Linda Petrulio, is an individual and a citizen of the Commonwealth of Pennsylvania.

2.      Plaintiff is female.

3.      Defendant, Teleflex Incorporated ("Defendant Teleflex"), is a Delaware corporation with a principal place of business at 155 South Limerick Road, Limerick, PA 19468.

4.      Defendant, Teleflex Medical Incorporated ("Defendant Teleflex Medical"), is a California corporation with a principal place of business at 155 South Limerick Road, Limerick, PA 19468.

5.      Defendants are engaged in an industry affecting interstate commerce and regularly do business in the Commonwealth of Pennsylvania.

6.      Defendant Teleflex controls and directs certain of Defendant Teleflex Medical's day-to-day business operations and personnel decisions.

7.      At all times material hereto, Defendants employed more than fifteen (15) employees.

8.      At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen, and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

9.      At all times material hereto, Defendants acted as employers within the meaning of the statutes which form the basis of this matter.

10.     At all times material hereto, Plaintiff was an employee of

Defendants within the meaning of the statutes which form the basis of this matter.

**III.   JURISDICTION AND VENUE**

11.    The causes of action which form the basis of this matter arise under Title VII and the PHRA.

12.    The District Court has jurisdiction over Count I (Title VII) pursuant to 42 U.S.C. §2000e-5 and 28 U.S.C. §1331.

13.    The District Court has supplemental jurisdiction over Count II (PHRA) pursuant to 28 U.S.C. §1367.

14.    Venue is proper in the District Court under 28 U.S.C. §1391(b) and 42 U.S.C. §2000(e)-5(f).

15.    On or about December 22, 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of acts of discrimination and retaliation alleged herein.  This Charge was cross-filed with the Pennsylvania Human Relations Commission ("PHRC"). Attached hereto, incorporated herein and marked as Exhibit "1" is a true and correct copy of the EEOC Charge of Discrimination (with personal identifying information redacted).

16.    On or about November 1, 2012, the EEOC issued to Plaintiff a Notice of Right to Sue for her Charge of Discrimination.  Attached hereto, incorporated herein and marked as Exhibit "2" is a true and correct copy of the Notice (with personal identifying information redacted).

17.    Plaintiff has fully complied with all administrative prerequisites for

the commencement of this action.

IV.   **FACTUAL ALLEGATIONS**

18.   On or about September 20, 2004, Plaintiff was hired by Defendants.

19.   In or around December 2007, Defendants sold their (Automotive) division in which Plaintiff worked.  As the Global Vice President of Human Resources of that division and a key member of the leadership team who reported to the President of the division, Plaintiff went with the sale.

20.   Starting in or about February 2009, Plaintiff returned to Defendants as the Human Resources Director for Global Operations for Defendants' Medical Division.

21.   Upon Plaintiff's return , she reported to the Executive Vice President of Global Operations (male) ("Executive Vice President").  Executive Vice President reported directly to Jeffrey Black (male), Chief Executive Officer ("CEO").  Benson Smith (male) replaced Mr. Black as CEO in or about January 2011.

22.   At all times material hereto, Plaintiff performed her duties in a highly competent manner.

23.   During her employment, Plaintiff was subjected to discriminatory comments and conduct because of her sex, including but not limited to, the following:

(a)   Out of Executive Vice President's direct reports, Plaintiff was the only female and the only one who did not have the title of Vice President;

(b)     Executive Vice President grabbed Plaintiff's breasts;

(c)     Executive Vice President grabbed Plaintiff's buttocks;

(d)     Executive Vice President brushed up against Plaintiff so that he touched her breasts;

(e)     Executive Vice President brushed up against Plaintiff so that he touched her buttocks;

(f)     Executive Vice President came into Plaintiff's office, shut the door and then unbuttoned and unzipped his pants;

(g)     When Plaintiff met Executive Vice President in his new office location, he asked her if she wanted to be "the first one to give me a blow job in my new office";

(h)     Executive Vice President told Plaintiff how good her breasts looked, and asked her if she was wearing a push-up bra;

(i)     Executive Vice President asked Plaintiff, "what happened to your tits";

(j)     Executive Vice President told Plaintiff that, "I would do you";

(k)     Executive Vice President told Plaintiff that, "I bet you're good in bed";

(l)     When Executive Vice President and Plaintiff were discussing a possible meeting with an employee, Plaintiff asked Executive Vice President if he wanted her to come with him to the meeting.  Executive Vice President responded, "only if you fuck me";

(m)     When Plaintiff asked Executive Vice President if he had met

a new female manager, his response was that, "I wouldn't let her give me a blow job";

        (n)    Executive Vice President sent an email including a list of those employees, including his direct reports, who were participating in an off-site meeting, but he excluded Plaintiff from the list.  When Plaintiff informed Executive Vice President of the same, he insinuated that she would be staying with him at the hotel by responding, "cos my favorite HR lady is staying with me";

        (o)    When a colleague forwarded a picture of his college-aged son celebrating Mardi Gras in New Orleans, Executive Vice President responded that, "if each set of beads represents getting laid at Mardi Gras, it was a good investment';

        (p)    Executive Vice President sent Plaintiff a picture of black stiletto shoes and told her that she needed to buy those shoes if she wanted to "be a real player"; and,

        (q)    Upon information and belief, Executive Vice President was engaged in sexually harassing conduct with other female employees of Defendants, and Defendants were aware of the same.

    24.    In or around May 2010, Plaintiff complained to Carrie Watt, Associate General Counsel and member of Defendants' Compliance Committee, regarding the sex discriminatory conduct to which she was being subjected.  Ms. Watt told Plaintiff to keep a "what-the-fuck" file.

    25.    On or about June 14, 2010, Plaintiff and Executive Vice President were at a meeting in Las Vegas.  During the course of the evening, Executive

Vice President repeatedly pressured Plaintiff to go to dinner with him, including, but not limited to, calling her several times on her cell phone and on her hotel room phone up until late that night.  Because of Executive Vice President's sexually harassing conduct towards Plaintiff, she was not comfortable having dinner alone with him and she declined his invitation.

26.     Upon information and belief, shortly after the Las Vegas trip, Executive Vice President told the Global Vice President of Human Resources, for the first time, that he wanted to terminate Plaintiff.

27.     On or about July 15, 2010, Plaintiff had her mid-year review meeting with Executive Vice President.  During the meeting, Executive Vice President told Plaintiff that she would no longer have global responsibility and that she would only be responsible for North American operations.

28.     At that time, Executive Vice President also told Plaintiff that she would be reporting directly to Tim Lipp (male), Vice President, North American Operations, instead of Executive Vice President.  Up until that time, Mr. Lipp, who reported directly to Executive Vice President, was on the same organizational level as Plaintiff.

29.     Defendants failed to provide any reason to Plaintiff as to why she was demoted.

30.     Shortly after Plaintiff began reporting directly to Mr. Lipp, he started unjustly criticizing her and scrutinizing her performance, including questioning her regarding issues that had already been resolved.

31.     On or about January 31, 2011, Plaintiff filed a complaint with

Defendants' Ethics Hotline regarding the sexual harassment to which she was being subjected.

32.     On the same day that Plaintiff filed a complaint through Defendants' Ethics Hotline, she informed Ms. Watt of the same.

33.     Later on the same day that Plaintiff filed her complaint with the Ethics Hotline, Mr. Lipp gave her a write-up regarding a "performance improvement discussion."  It was the first time that Plaintiff received a write-up regarding her performance during her employment with Defendants.

34.     Upon information and belief, Executive Vice President was interviewed regarding Plaintiff's complaint on or about February 15, 2011.  He resigned on that same day.

35.     Ms. Watt informed Plaintiff that Defendants did not have to take any action regarding her complaints because Executive Vice President resigned.

36.     On or about March 4, 2011, Plaintiff applied for the open position of Global Vice President of Human Resources and expressed her interest in the same to Mr. Smith.  When she did not receive any response, Plaintiff followed up with Mr. Smith regarding the open position on or about May 12, 2011.

37.     Shortly after Plaintiff followed up with Mr. Smith regarding her application for the open position, she was informed that she was not going to be interviewed for the position and that Defendants were selecting an outside candidate for the same.

38.     On or about May 31, 2011, Melissa Manion, an external hire, started as the Global Vice President of Human Resources.  Plaintiff began

8

reporting directly to Ms. Manion.

39.     On or about June 1, 2011, Plaintiff had her first meeting with Ms. Manion. During that meeting, Ms. Manion told Plaintiff that she was aware of Plaintiff's sexual harassment complaint.

40.     During July and August 2011, certain of Defendants' Human Resources employees had to re-interview for their jobs due to the reorganization of the group.

41.     Plaintiff interviewed for her current role, that of Human Resources Director of North America Operations. She also interviewed for the position of the Human Resources Director of Global Functions, which she had held previously during her employment.

42.     On or about December 12, 2011, Plaintiff was told that Defendants had selected an external candidate for the position of Human Resources Director of Global Functions. That individual was less qualified for the position than Plaintiff. Defendants did not inform Plaintiff of the reason why they failed to select her for the position.

43.     On that same day, Defendants terminated Plaintiff's employment. She was told that the reason for the same was that Defendants needed someone who would be more "forward-thinking" and strategic.

44.     Plaintiff was never informed of the reason why she was not selected for the position of Human Resources Director for North America Operations, the position that she held at the time of her termination, after her interview for the same.

45.     Defendants' asserted reason for terminating Plaintiff is pretextual.

46.     Plaintiff's sex was a motivating and/or determinative factor in Defendants' discriminatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, Defendants' demotion of Plaintiff and the termination of Plaintiff.

47.     Plaintiff's complaining of discrimination was a motivating and/or determinative factor in Defendants' retaliatory treatment of Plaintiff, including the hostile work environment to which Plaintiff was subjected, Defendants' demotion of Plaintiff, Defendants' failure to select Plaintiff for the positions of Global Vice President of Human Resources, Human Resources Director for Global Functions, and Human Resources Director for North America Operations, and the termination of Plaintiff.

48.     Defendants failed to prevent or address the discriminatory and retaliatory conduct referred to herein and further failed to take corrective and remedial measures to make the workplace free of discriminatory and retaliatory conduct.

49.     The retaliatory actions taken against Plaintiff after she complained of discriminatory conduct would have discouraged a reasonable employee from complaining of discrimination.

50.     The discriminatory and retaliatory conduct of Defendants, as alleged herein, was severe and/or pervasive enough to make a reasonable person believe that the conditions of employment had been altered and that a

hostile work environment existed, and made Plaintiff believe that the conditions of employment had been altered and that a hostile work environment existed.

51.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendants, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings and/or earning capacity, loss of benefits, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, the full extent of which is not known at this time.

52.    Defendants acted with malice and/or reckless indifference to Plaintiff's protected rights.

53.    The conduct of Defendants, as set forth above, was outrageous under the circumstances and warrants the imposition of punitive damages against Defendants.

## COUNT I - Title VII

54.    Plaintiff incorporates herein by reference paragraphs 1 through 53 above, as if set forth herein in their entirety.

55.    By committing the foregoing acts of discrimination and retaliation against Plaintiff, Defendants have violated Title VII.

56.    Said violations were intentional and warrant the imposition of punitive damages.

57.    As a direct and proximate result of Defendants' violation of Title VII, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

58.     Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until this Court grants the relief requested herein.

59.     No previous application has been made for the relief requested herein.

## COUNT II - PHRA

60.     Plaintiff incorporates herein by reference paragraphs 1 through 59 above, as if set forth herein in their entirety.

61.     Defendants, by the above improper and discriminatory and retaliatory acts, have violated the PHRA.

62.     Said violations were intentional and willful.

63.     As a direct and proximate result of Defendants' violation of the PHRA, Plaintiff has sustained the injuries, damages, and losses set forth herein and has incurred attorney's fees and costs.

64.     Plaintiff is now suffering and will continue to suffer irreparable injuries and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

65.     No previous application has been made for the relief requested herein.

## RELIEF

WHEREFORE, Plaintiff seeks damages and legal and equitable relief in connection with Defendants' improper conduct, and specifically prays that the Court grant the following relief to the Plaintiff by:

(a) declaring the acts and practices complained of herein to be in violation of Title VII;

(b) declaring the acts and practices complained of herein to be in violation of the PHRA;

(c) enjoining and permanently restraining the violations alleged herein;

(d) entering judgment against the Defendants and in favor of the Plaintiff in an amount to be determined;

(e) awarding compensatory damages to make the Plaintiff whole for all lost earnings, earning capacity and benefits, past and future, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

(f) awarding compensatory damages to Plaintiff for past and future pain and suffering, emotional upset, mental anguish, humiliation, and loss of life's pleasures, which Plaintiff has suffered or may suffer as a result of Defendants' improper conduct;

(g) awarding punitive damages to Plaintiff under Title VII;

(h) awarding Plaintiff such other damages as are appropriate under Title VII and the PHRA;

       (i)      awarding Plaintiff the costs of suit, expert fees and other disbursements, and reasonable attorney's fees; and;

       (j)      granting such other and further relief as this Court may deem just, proper, or equitable including other equitable and injunctive relief providing restitution for past violations and preventing future violations.


                            **CONSOLE LAW OFFICES LLC**

Dated:  <u>12/26/12</u>        BY:   _____
                              Stephen G. Console (36656)
                              Caren N. Gurmankin (205900)
                              1525 Locust St., 9th Floor
                              Philadelphia, PA 19102
                              (215) 545-7676
                              (215) 545-8211 (fax)

                              Attorneys for Plaintiff,
                              Linda Petrulio

# Exhibit 1

| CHARGE OF DISCRIMINATION | AGENCY<br>FEPA<br>x   EEOC | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See privacy statement before consolidating this form. | | 530-2012-00877 |

| STATE OR LOCAL AGENCY: _____PHRC_____ | | |

| NAME (Indicate Mr., **Ms.**, Mrs.)<br>Linda Petrulio | | HOME TELEPHONE NUMBER *(Include Area Code)*<br>████████ |
|---|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP<br>Chester Springs, PA 19425 | DATE OF BIRTH<br>████ |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP, COMMITTEE, STATE OF LOCAL GOVERNMENT WHO DISCRIMINATED AGAINST ME (If more than one than list below)

| NAME<br>Teleflex Incorporated | NUMBER OF EMPLOYEES, MEMBERS<br>➤  11,000 | TELEPHONE (Include Area Code)<br>610-948-5100 |
|---|---|---|
| STREET ADDRESS<br>155 South Limerick Road | CITY, STATE AND ZIP<br>Limerick, PA  19468 | COUNTY<br>Montgomery |

| CAUSE OF DISCRIMINATION *(Check appropriate box(es))*<br>Race   Color   xx Sex   Religion   National Origin<br>    XX Retaliation   Age   Disability   Other *(Specify)* | DATE DISCRIMINATION TOOK PLACE<br>12/12/2011<br>*Earliest*                    *Latest*<br><br>Continuing Violation |
|---|---|

THE PARTICULARS ARE:

A.    1.  Relevant Work History

I was hired by Respondent on September 20, 2004 and advanced through various Human Resource positions.  My last position was Global Vice President of Human Resources ("HR") of the Automotive Division.  This Division was sold to Kongsberg Automotive in December, 2007 and, as a key member of the leadership team reporting to the President, I went with the sale.  I was rehired by Respondent's Medical Division on February 27, 2009 as the HR Director for Global Operations with HR responsibility for sixteen (16) manufacturing and distribution sites globally.  Beginning at that time, I reported to ████████, Executive Vice President of Global Operations, who reported to Jeffrey Black, CEO of Respondent.  There were three other individuals who reported to Mr. ████████.  Tim Lipp, Vice President, North America Operations; Geoffrey Hills, Global Vice President, Procurement; and Tony Kennedy, Vice President, Operations, Europe, Middle East, and Africa ("EMEA").  I had three direct reports, who included: Lisa Rhodes, HR Generalist; Abigail Tomer, HR Generalist in RTP Distribution Center; and, as of approximately July 2010, Brandy Boylan, HR Generalist in the Dallas Distribution Center.

| xI want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY - (when necessary for State and Local Requirements) |
|---|---|
| *[signature]* Linda Petrulio | I swear of affirm that I have read the above charge and that it is true to the best of my knowledge information and belief. |
| I declare under penalty or perjury that the foregoing is true and correct. | |

| x _December 21, 2011_ | SIGNATURE OF COMPLAINANT |
| Date:                          Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day Month, and year) |



Page 3 of 7

In July 2010, I was demoted and from July, 2010, until May, 2011, I reported to Mr. Lipp. At the end of May, I started reporting to Melissa Manion, who was hired by Respondent on or around May 31, 2011 as Global Vice President of HR for Respondent. Ms. Manion reports to Laurence Miller, Executive Vice President and General Counsel for Respondent. Mr. Miller reports to Benson Smith, who replaced Mr. Black as CEO of Respondent on or about January 31, 2011. On December 12, 2011, I was notified that I was being terminated from the company, effective January 1, 2012.

Throughout my seven years of employment with Respondent, I have been a loyal, dedicated and hard-working employee. In my yearly performance reviews I consistently received positive evaluations. Every year I worked for Respondent, I received annual merit increases. I also received yearly bonuses and restricted stock in both 2010 and 2011. The Restricted Stock is part of the Respondent's Long Term Incentive Plan.

2.   Harm Summary

I believe that I was subjected to sex discrimination by Respondent, including being subject to a hostile work environment, failure to promote, demotion, and retaliation for complaining of the same. Evidence of discriminatory conduct includes, but is not limited to, the following:

a.   Mr. ████████ repeatedly brushed up against my breasts and my buttocks. Mr. ████████ also grabbed both my buttocks and breasts numerous times;

b.   Mr. ████████ repeatedly made comments about my body, including, but not limited to the following:

  i.   In an email dated August 26, 2009, Mr. ████████ told me that a fellow male employee of Respondent thought I had "put on weight";

  ii.   Referencing how "good" my breasts were looking and if I were wearing a push up bra;

  iii.   Asking me "what happened to your tits?"; and,

  iv.   Telling me "you have a line across your butt."

c.   Other comments Mr. ████████ made to me during the time that I reported to him included, but are not limited to the following:

  i.   "I would do you," meaning that he would have sex with me; and,

  ii.   "I bet you're good in bed."

Page 4 of 7

d. Mr. ▮▮▮▮ repeatedly sent me emails with sexual references, including, but not limited to the following:

  i. On April 7, 2010, Mr. ▮▮▮▮ sent an email in reference to an offsite meeting, with details including participants. When I responded that he had forgotten to include me, he replied by insinuating that I would be staying with him at the hotel ("cos my favorite HR Lady is staying with me") [sic], and

  ii. On May 8, 2010, Mr. ▮▮▮▮ sent me an email stating "these are the shoes I was telling you about that you need to buy if you want to be a real player" with an attached picture of a high stiletto heel.

e. In late Spring, 2010, I spoke to Carrie Watt, Associate General Counsel and member of the Compliance Committee, about Mr. ▮▮▮▮'s inappropriate conduct. In response, Ms. Watt suggested that I keep a "what-the-fuck-file."

f. On or about June 9, 2010, Mr. ▮▮▮▮ came into my office, unbuttoned and unzipped his pants, showing his underwear, and made a sexual comment. I told Mr. ▮▮▮▮ that he was acting inappropriately and to stop.

g. On or about June 9, 2010, Mr. ▮▮▮▮ was in my office on a conference call with David Suchy, Strategic Development. The three of us were discussing meeting an employee in Singapore. As Mr. ▮▮▮▮ and I were going to be traveling through Singapore for work in early October, 2010, I mouthed to Mr. ▮▮▮▮ "do you want me to come with you to meet him?" His response was "only if you fuck me."

h. On or about June 10, 2010, Mr. Suchy and I were talking about how the conference call went the previous day. Mr. Suchy commented that the call was "frustrating. He [Mr. ▮▮▮▮] broke every EEO law during that meeting."

i. On June 14, 2010, Mr. ▮▮▮▮ invited me to dinner via email at a meeting in Las Vegas. The email stated, in part, "I would love the honor of taking you to dinner this evening...." I did not want to go to dinner and suggested drinks instead. Mr. ▮▮▮▮ then repeatedly emailed me regarding dinner. He also called me that evening no fewer than ten (10) times on my cell phone and on my hotel room until eleven p.m., pressuring me to go to dinner. I declined his invitation. Due to his pervasive sexual conduct toward me, I interpreted his invitation as propositioning me to sleep with him.

j. Based on information and below, after Mr. ▮▮▮▮ returned to work from the Las Vegas meeting, Mr. ▮▮▮▮ spoke with Sean O'Neill, former Global Vice President of HR, and expressed his desire to terminate me immediately. This is in contrast to early 2010, when there was a request from the Board of Directors to change my reporting relationship from Mr. ▮▮▮▮ to another employee of Respondent. Mr. ▮▮▮▮ even went to Mr. Black, the then-

Page 5 of 7

CEO of Respondent, to ensure that he would continue to be my direct supervisor.

k. On or about July 15, 2010, Mr. ████ informed me that I was being demoted and I would no longer have global HR responsibility; I now only had HR responsibility for North America Operations. At this time, I started reporting to Mr. Lipp instead of Mr. ████. Until this point, Mr. Lipp had been one of my peers.

l. Despite the change in report, Mr. ████ continued to sexually harass me.

m. On or about July 29, 2010, Mr. ████ commented on my breasts and buttocks.

n. That same day, when I asked Mr. ████ if he had met the new Continuous Improvement Manager in our Asheboro plant, he responded: "I wouldn't let her give me a blow job."

o. On or about October 20, 2010, Mr. ████, upon showing me his new office, stated to me: "How would you like to be the first one to give me a blow job in my new office?"

p. My repeated requests for Mr. ████ to stop engaging in sexual harassment were denied.

q. I know of at least two other female employees of Respondent who spoke to me about how Mr. ████'s behavior and comments "cross the line" of what is acceptable.

r. Kevin Gordon, former CFO of Respondent, conducted an investigation into allegations that Mr. ████ was having an inappropriate relationship with another female executive and that the investigation showed that this allegation was substantiated. He further informed Mr. Black, the CEO, who then moved the female employee to a corporate position in the same office. No other actions were taken.

s. Shortly after I began reporting to Mr. Lipp, a close friend of, and former direct report to Mr. ████, Mr. Lipp started complaining about baseless issues, including my travel schedule which had been already agreed upon.

t. On or about January 31, 2011, I filed a complaint about Mr. ████'s sexual harassment with Respondent's Ethics Hotline, pursuant to Respondent's policy regarding reporting sexual harassment.

u. The morning I filed the complaint through the company's Ethics Hotline, I advised Ms. Watt that I had just filed an ethics complaint about Mr. ████'s sexual harassment of me. She expressed her approval, as she had previously advised me to begin keep records of Mr. ████'s inappropriate conduct and behavior.



v.  That same day, I received a written notification from Mr. Lipp regarding perceived performance concerns.

w.  On or about February 15, 2011, Steven Sutton, an outside attorney, interviewed Mr. ████████ in connection with my ethics complaint. That same day, Mr. ████████ tendered his resignation from Respondent.

x.  After Mr. ████████ tendered his resignation, I heard nothing more regarding my allegedly poor performance from Mr. Lipp.

y.  On or about March 4, 2011 I applied to the CEO, Benson Smith, for the open position of Global Vice President of Human Resources. I was an excellent, qualified candidate for the position. I did not hear anything, and followed up on May 12, 2011. Shortly after that, I was advised by Mr. Miller that I was not going to be interviewed for this position and that Respondent was selecting an outside candidate.

z.  On or about May 31, 2011, Melissa Manion was hired for the Global Vice President of Human Resources position and I began reporting to her.

aa. On or about June 1, 2011, when I first met with Ms. Manion, she told me that she had been advised by Mr. Miller about my ethics complaint against Mr. ████████.

bb. Toward the end of July and the beginning of August, the HR Senior Leadership team was discussing reorganization and every Senior HR employee had to re-interview for roles. In August, I re-interviewed for my current position and also interviewed for the HR Global Functions role. Ms. Manion told me that the latter was the most likely job for me as I had already maintained this role in 2005 and I was already working out of Limerick, where the HR Global Functions job was located.

cc. On Friday, December 9, 2011, I received an email from Ms. Manion scheduling a meeting between Ms. Manion and me the following Monday, December 12, 2011.

dd. I found out Monday, December 12, 2011, that Ms. Manion hired Jill Schadler, someone from outside the company with less experience than I had, for the HR Global Functions position.

ee. When I met with Ms. Manion on December 12, 2011, she advised me of my termination.

B.        1.        Respondent's Stated Reasons

                    a)  Respondent has not offered any explanation as to why I was sexually harassed and placed in a hostile work environment because of my sex;



b) Respondent has not offered any explanation as to why I was demoted after declining the sexual advances of my supervisor;

c) Respondent has not offered any explanation as why I was not promoted to Global Vice President of Human Relations, a position given to Melissa Manion, an outside hire;

d) Respondent has not offered any explanation as to why I was not given the open Human Resources Global Functions job;

e) Respondent has not offered any explanation as to why I was not given the Human Resources for North America Operations job, the position I currently held; and

f) Respondent has not offered any explanation as to why I was terminated.

C.      1.    Statutes and Basis for Allegations

I believe that Respondent has discriminated against me by subjecting me to a hostile work environment, demoting me, failing to promote me, failing to place me in open jobs, and terminating me because of my sex and/or in retaliation for complaining about sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, as amended, 43 P.S. §951, *et seq.* ("PHRA").

INFORMATION FOR COMPLAINANTS & ELECTION OPTION
TO DUAL FILE WITH THE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

**Linda Petrulio v. Teleflex Incorporated**

EEOC No. ~~530-2012-00877~~

You have the right to file this charge of discrimination with the Pennsylvania Human Relations Commission (PHRC) under the Pennsylvania Human Relations Act. Filing your charge with PHRC protects your state rights, especially since there may be circumstances in which state and federal laws and procedures vary in a manner which would affect the outcome of your case.

Complaints filed with the PHRC must be filed within 180 days of the act(s) which you believe are unlawful discrimination. If PHRC determines that your PHRC complaint is untimely, it will be dismissed.

If you want your charge filed with the PHRC, including this form as part of your EEOC charge, with your signature under the verification below, will constitute filing with the PHRC. You have chosen EEOC to investigate your complaint, so PHRC will not investigate it and, in most cases, will accept EEOC's finding. If you disagree with PHRC's adoption of EEOC's finding, you will have the chance to file a request for preliminary hearing with PHRC.

Since you have chosen to file your charge first with EEOC, making it the primary investigatory agency, the Respondent will not be required to file an answer with PHRC, and no other action with PHRC is required by either party, unless/until otherwise notified by PHRC.

If your case is still pending with PHRC after one year from filing with PHRC, you have the right to file your complaint in state court. PHRC will inform you of these rights and obligations at that time.

**[Sign and date appropriate request below]**

__X__ I want my charge filed with PHRC. I hereby incorporate this form and the verification below into the attached EEOC complaint form and file it as my PHRC complaint. I request EEOC to transmit it to PHRC.

__X__ *I understand that false statements in this complaint are made subject to the penalties of 18 Pa.C.S. §4904, relating to unsworn falsification to authorities.*

X _Linda Petrulio_

Signature and Date (Linda Petrulio)    _12-21-11_

# Exhibit 2

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: Linda Petrulio | From: Philadelphia District Office |
|---|---|
| ▮▮▮▮▮▮▮▮▮ | 801 Market Street |
| Chester Springs, PA 19425 | Suite 1300 |
| | Philadelphia, PA 19107 |

☐   *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2012-00877 | Legal Unit | (215) 440-2828 |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court** <u>WITHIN 90 DAYS</u> **of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred** <u>more than 2 years (3 years)</u> **before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Spencer H. Lewis, Jr.,
**District Director**

11/1/12
*(Date Mailed)*

cc:   Kelli McCoy, Human Resources Executive
TELEFLEX INC
155 S Limerick Rd
Limerick, PA 19468

Caren N. Gurmankin, Esq.
CONSOLE LAW OFFICES, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102