**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LINDA PETRULIO,** | **CIVIL ACTION** |
|       **Plaintiff,** | |
| | |
|   **v.** | |
| | |
| **TELEFLEX INCORPORATED, and** | **NO.  12-7187** |
| **TELEFLEX MEDICAL** | |
| **INCORPORATED,** | |
|       **Defendants.** | |

**DuBois, J.**                                                         **November 4, 2014**

**M E M O R A N D U M**

## I.     INTRODUCTION

This is an employment discrimination case. Plaintiff Linda Petrulio alleges in the

Complaint that defendants Teleflex Incorporated and Teleflex Medical Incorporated

discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act ("PHRA"),

43 Pa. Cons. Stat. § 951 et seq. Plaintiff's claims arise primarily from defendants' failure to

promote her to the position of Global Vice President of Human Resources ("Global HR VP")

and from defendants' decision to terminate her employment.

Presently before the Court are: (1) defendants' Motion for Summary Judgment;

(2) plaintiff's Motion to Strike the Report and Exclude the Proposed Expert Testimony of Dr.

Jon Younger ("Motion to Exclude Dr. Younger's Testimony"); (3) plaintiff's Motion to Strike

the Report and Preclude the Proposed Expert Testimony of Dr. Charles Sodikoff ("Motion to

Exclude Dr. Sodikoff's Testimony"); and (4) plaintiff's Motion to Strike Portions of the Expert

Report and to Exclude Testimony from the Center for Forensic Economic Studies Referring to or

Relying Upon the Report of Dr. Charles Sodikoff ("Motion to Exclude Center for Forensic

Economic Studies Testimony"). For the reasons that follow, defendants' Motion for Summary Judgment is granted in part and denied in part, plaintiff's Motion to Exclude Dr. Younger's Testimony is denied, plaintiff's Motion to Exclude Dr. Sodikoff's Testimony is granted in part and denied in part, and plaintiff's Motion to Exclude Center for Forensic Economic Studies Testimony is granted.

## II.    BACKGROUND[1]

### A.    The Parties

Defendants are global suppliers of medical devices used in critical care and surgery. (Pl.'s Resp. Defs.' Statement Undisputed Material Facts ("Pl.'s SOF") ¶ 1.) Plaintiff, a Human Resources professional, was initially employed by defendants from September 2004 through December 2007. (Id. ¶ 11.) Plaintiff left her employment with defendants in December 2007 when the division in which she worked was sold to another company. (Id. ¶ 23.) Plaintiff was re-hired by defendants in February 2009 to serve as Director of Human Resources for Global Operations. (Id. ¶ 25.) In this position, plaintiff reported directly to the Executive Vice President of Global Operations, Mr. X.[2] (Id. ¶ 11.)

### B.    Allegations of Sexual Harassment

According to plaintiff, Mr. X began to sexually harass her in August 2009. (Id. ¶ 41.) As part of a continuing pattern of sexual harassment, plaintiff alleges, inter alia, that Mr. X "grabbed [her] breasts . . . [and] buttocks," sent her inappropriate emails, and propositioned her for sex.

---

[1]    As required on a motion for summary judgment, the facts set forth in this Memorandum are presented in the light most favorable to plaintiff, the non-moving party.  The Court refers to the parties' statements of material facts where those facts are not controverted. Where they are controverted, the factual disputes are noted.

[2]    By Order dated February 28, 2014 (Document No. 23), the identity of the Executive Vice President of Global Operations has been sealed.

(Id. ¶¶ 40–50; Compl. ¶ 23.) In late Spring 2010, plaintiff spoke with Carrie Watt, Associate

General Counsel and one of defendants' Compliance Officers, about Mr. X's inappropriate

conduct. (Pl.'s SOF ¶¶ 55–56.) The parties dispute the contents of the conversation between

plaintiff and Watt, but it is undisputed that the meeting concluded with Watt telling plaintiff to

document any specific instances of discriminatory or inappropriate conduct that she experienced.

(Id. ¶¶ 55–65.)

After meeting with Watt, plaintiff contends that Mr. X continued to sexually harass her.

(Id. ¶¶ 68–91.) Among other allegations, plaintiff contends that while at an offsite company

meeting in Las Vegas, Nevada in June 2010, Mr. X invited her to dinner with the ulterior motive

of propositioning her for sex. (Id. ¶ 75.) Defendants assert that the dinner invitation was strictly

professional and that Mr. X wanted to help plaintiff prepare for a presentation the next day. (Id.)

Plaintiff did not go to dinner with Mr. X that evening. (Id. ¶ 83.) Thereafter, around July 15,

2010, plaintiff alleges that Mr. X demoted her by taking away her global responsibilities and

changing her title from Human Resources Director for Global Operations to Human Resources

Director for North America Operations. (Id. ¶ 92.) As a result of the change, plaintiff no longer

reported directly to Mr. X; instead, she reported to Tim Lipp, Teleflex's Vice President of North

American Operations. (Id.) Plaintiff asserts that Mr. X demoted her because she had refused his

sexual advances. (Id.)

On January 31, 2011, plaintiff called defendants' Ethics Hotline and formally complained

about Mr. X's allegedly inappropriate conduct. (Id. ¶ 126.) After plaintiff filed this ethics

complaint, defendants engaged an outside law firm to undertake an internal investigation. (Id.

¶ 127.) On February 15, 2011, Mr. X tendered his resignation, but he remained in his position

until June 30, 2011. (Id. ¶ 160.) Plaintiff does not assert that Mr. X engaged in any further sexual harassment after she filed her ethics complaint. (Id. ¶ 267–70.)

### C.    Global HR VP Job Vacancy

In December 2010, Sean O'Neill, then-Global HR VP, left Teleflex. (Id. ¶ 185.) Defendants then engaged an executive search firm, Diversified Search Odgers Berndtson ("DSOB"), to conduct a search for a candidate to replace O'Neill as Global HR VP. (Id. ¶ 187.) Defendants contend that they were seeking an outside candidate with experience in international health care and emerging markets. (Id. ¶ 186.) Plaintiff asserts that defendants did not rule out hiring an internal candidate for the position and that the "Position Description and Ideal Candidate Profile" provided to defendants by DSOB in February 2011 does not identify experience in health care or emerging markets as a qualification or a "must-have" attribute. (Id. ¶¶ 186–88.)

On March 24, 2011, plaintiff emailed Benson Smith, Teleflex's new CEO, stating her interest in being considered for the Global HR VP job. (Id. ¶ 190.) Plaintiff asserts that she was fully qualified for the job. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. ("Pl. Opp'n Br.") 20–21.) Smith did not respond to plaintiff's email; instead, he forwarded it to Lawrence Miller, defendants' General Counsel and Chief Administrative Officer. (Pl.'s SOF ¶ 190.) Plaintiff contends that Miller then asked Carrie Watt — the Compliance Officer to whom plaintiff had initially complained about Mr. X's allegedly inappropriate conduct — whether he "should further consider [plaintiff] as a viable applicant . . . in light of her [ethics] complaint." (Pl.'s Statement Additional Facts Preclude Summ. J. ¶ 184; Dep. of Carrie Watt, Pl.'s Opp'n Br. Ex. 95, at 361–62.) Defendants assert that Watt told Miller: "if [plaintiff's] having made a complaint is the only reason why you should consider her, then, no, certainly not. It should be based on our

understanding of [plaintiff's] fitness for the role." (Defs.' Supplemental Statement Undisputed Facts Supp. Summ. J. ¶ 274.)

On May 12, 2011, Miller emailed plaintiff, stating: "Happy to meet and explain the direction – which is we are planning to bring in an outside candidate for the role. I want you to understand that we did review your cv [sic] in light of the position as well as speak to a number of management about your candidacy." (Pl.'s SOF ¶ 191.) Plaintiff asserts that Mr. X had been "grooming her to take over O'Neill's position for the last two [] years, but that, as of [late December 2010 or early January 2011], he and [then-CEO Jeffrey] Black would not even consider her" for the job. (Id. ¶ 185.) Defendants ultimately hired an outside candidate, Melissa Manion, to fill the Global HR VP job vacancy. (Id. ¶¶ 194–95.) Manion began her employment as Global HR VP on May 31, 2011. (Id. ¶ 195.)

### D.    Termination of Plaintiff's Employment

As part of Manion's orientation for the Global HR VP position, she was informed that plaintiff had made an ethics complaint arising out of Mr. X's allegedly inappropriate behavior. (Id. ¶ 198.) The purpose of providing this information to Manion was so that she would be "sensitive to that issue" and would be "aware [of] what occurred . . . as she was developing her plan for her HR organization." (Id.) Manion then began the process of restructuring the Human Resources department. (Id. ¶ 202.) As part of this process, Manion utilized a ranking system[3] whereby she assigned point values to the extent that she determined current Human Resources employees, including plaintiff, possessed certain "competencies." (Id. ¶¶ 230–31.) Manion's

---

[3]     Defendants assert that the process used by Manion is well-established in the Human Resources field. The reliability and legitimacy of this process is the subject of plaintiff's Motion to Exclude the Testimony of Dr. Jon Younger, and is discussed infra in Part IV.B.1.

ranking system also took into account performance rating reviews from 2009 and 2010. (Id. ¶ 230.)

Plaintiff and another employee, Ms. Y,[4] received the lowest scores at the conclusion of Manion's ranking process. (Id. ¶ 233.) According to Manion, this demonstrated that plaintiff and Ms. Y possessed "insufficiently strong competencies to be offered positions in the restructured Human Resources organization going forward." (Mem. Law Supp. Defs.' Mot. Summ. J. ("Defs.' Mem. Law") 32.) On December 12, 2011, plaintiff and Ms. Y were notified that their employment with defendants was terminated. (Pl.'s SOF ¶ 235.) Plaintiff contends that she and Ms. Y were terminated because they were females who had complained to defendants about sexual harassment. (Id. ¶ 233.)

### III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### A.  Legal Standard

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

---

[4]   By Order dated May 28, 2014 (Document No. 50), the identity of this employee has been sealed.

A factual dispute is material when it "might affect the outcome of the suit under the governing law" and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

### B.  Discussion

Plaintiff asserts three claims against defendants under Title VII and the PHRA:[5] (1) sex discrimination in terminating plaintiff's employment; (2) retaliation in failing to promote plaintiff to the position of Global HR VP and in terminating plaintiff's employment; and (3) retaliatory hostile work environment.[6] The Court will address each claim in turn.

### 1)  Claim of Sex Discrimination Based on Termination

Plaintiff first asserts that defendants engaged in sex discrimination when they terminated her employment. See 42 U.S.C. § 2000e-2(a)(1) (prohibiting employment discrimination on the basis of "race, color, religion, sex, or national origin"). To establish sex discrimination, a plaintiff must show that the employer bore a sexually discriminatory animus against the employee and that this animus manifested itself in some challenged action, whether it be

---

[5]     Courts in the Third Circuit construe Title VII claims consistently with PHRA claims. Thus, the analysis of plaintiff's Title VII claims applies with equal force to her PHRA claims. See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 n.5 (3d Cir. 2006).

[6]     Plaintiff acknowledges that she does not have a timely claim relating to her demotion from Human Resources Director for Global Operations to Human Resources Director for North America Operations as a discrete act under Title VII or the PHRA. She further acknowledges that she does not have a timely claim for failure to promote as a discrete act under the PHRA. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n Br.") 36 n.3.) Accordingly, the Motion for Summary Judgment is granted with respect to plaintiff's claims under Title VII and the PHRA which are based on her demotion and failure to promote as discrete acts.

dismissal, failure to promote, or failure to hire. <u>Lewis v. Univ. of Pittsburgh</u>, 725 F.2d 910, 914 (3d Cir. 1983). In the absence of direct evidence of discrimination, a plaintiff can show discrimination using the three-prong burden-shifting analysis originally set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997). Plaintiff bears the burden of establishing a prima facie case of discrimination. <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802. If plaintiff establishes a prima facie case, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action. <u>See</u> <u>id.</u> This burden is one of production, not persuasion. <u>Smith v. City of Allentown</u>, 589 F.3d 684, 690 (3d Cir. 2009). If defendant offers a legitimate, nondiscriminatory reason, in order to survive summary judgment, plaintiff must submit evidence "to demonstrate that the employer's proffered rationale was a pretext for [] discrimination." <u>Id.</u> Notwithstanding this burden-shifting framework, plaintiff always bears the ultimate burden of persuading the trier of fact that defendant intentionally discriminated against plaintiff. <u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 799 n.10 (3d Cir. 2003).

### a.  Prima Facie Case Under Title VII and the PHRA

A plaintiff makes out a prima facie case of sex discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action was made "under circumstances that give rise to an inference of unlawful discrimination." <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 494 (3d Cir. 1995) (citing <u>Tx. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)).

Defendants contest only the second and fourth elements of a prima facie case. The Court will address each in turn.

### 1.  Second Element of Plaintiff's Prima Facie Case: Qualification for Position

Defendants argue that plaintiff cannot establish the second element of her prima facie case because "[Global HR VP] Manion determined that [p]laintiff was not qualified for any position in the HR Department going forward." (Defs.' Reply Supp. Mot. Summ. J. ("Defs.' Reply Br.") 40.) The Court rejects this argument.

To show that she was qualified, plaintiff "must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the [criteria] identified by the employer or that the employer did not actually rely upon the stated [criteria]." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) (citing Fuentes v. Perskie, 32 F.3d 759, 767 (3d Cir. 1994)). Thus, the issue is not whether defendants determined plaintiff to be qualified, but rather whether a reasonable juror could find that plaintiff was qualified for the job from which she was terminated.

Plaintiff has asserted that she was qualified to remain in her position based on the evidence of, inter alia, her ten to fifteen years of experience in a human resources leadership role, her experience in regulated industries and working with executive leadership, and the fact that she received a rating of "[f]ully [m]eets [expectations]" in defendants' most recent evaluation of her performance. (Pl. Opp'n Br. 21, 26.) The Court concludes that there is sufficient evidence from which a reasonable juror could find that plaintiff was qualified for the position from which she was terminated. There is thus a genuine dispute of material fact as to whether the second element of plaintiff's prima facie case is satisfied.

### 2. Fourth Element of Plaintiff's Prima Facie Case: Adverse Employment Action Based on Unlawful Discrimination

Defendants argue next that plaintiff cannot show that her termination was made "under circumstances that give rise to an inference of unlawful discrimination." Waldron, 56 F.3d at 494. A plaintiff may demonstrate the fourth element of the prima facie case by showing that her employer treated a similarly-situated employee who is not within the protected class differently than her, or by presenting other evidence that would give rise to an inference of unlawful discrimination against her. Cange v. Phila. Parking Auth., No. 08–3480, 2009 WL 3540784, at *6 (E.D. Pa. Oct. 30, 2009); see also Sarullo, 352 F.3d at 798 (plaintiff must "establish some causal nexus between [her] membership in a protected class" and the adverse employment decision).

Defendants first argue that such a causal nexus is lacking in this case because the decision to terminate plaintiff's employment was made by a woman, Global HR VP Manion. (Defs.' Reply Br. 40.) The Court rejects this argument. The fact that the termination decision was made by a woman is not determinative of the question of whether that decision was motivated by discriminatory animus. See Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group.").

Defendants further argue that "there is absolutely no evidence whatsoever that the fact that [p]laintiff is a woman played any part in the decision to terminate [p]laintiff's employment." (Defs.' Reply Br. 40.) The Court agrees. Although plaintiff points to the fact that the only two

employees Manion terminated were female,[7] this evidence fails to establish a causal link because there were other female employees in the Human Resources department who were not terminated as part of the restructuring; this is not a situation in which only female employees were terminated while male employees were retained. (Id. 22, 40.) Moreover, the positions left open by plaintiff and Ms. Y were both filled by women. (Id.); see Hare v. Potter, 220 F. App'x 120, 133 n.7 (3d Cir. 2007) (noting that plaintiff failed to make out a prima facie case of sex discrimination because women were selected for the jobs plaintiff did not receive). Thus, the Court concludes that plaintiff has failed to "establish [a] causal nexus between [her] membership in a protected class," i.e. her status a woman, and the termination decision. Sarullo, 352 F.3d at 798. Because there is no genuine dispute of material fact as to whether plaintiff's termination was made "under circumstances that give rise to an inference of unlawful discrimination," Waldron, 56 F.3d at 494, defendants are entitled to summary judgment on this claim.

### b.  Remaining Steps of the McDonnell Douglas Framework

Even assuming arguendo that plaintiff had established a prima facie case, plaintiff has failed to demonstrate that there is a genuine dispute of material fact as to whether defendants' proffered legitimate, nondiscriminatory reason for terminating plaintiff is pretext for sex discrimination.

At the second step of the McDonnell Douglas framework, defendants aver that plaintiff was terminated because "in the view of Teleflex's new Vice President of HR, [Melissa Manion,] who was charged with transforming the HR department to add value and align with Teleflex's

---

[7]     For instance, plaintiff challenges Manion's ranking process, asserting that Sam Garod, a male employee with ten years less experience than plaintiff, was retained after the restructuring even though Manion noted that "[t]here is some evidence to indicate that Sam has had some contentious relationships with HR colleagues that have not been managed well, and instead have become a disruption . . . ." (Pl.'s Opp'n Br. 29.)

newly-reorganized business units, [p]laintiff did not have the leadership and strategic skills that Manion was looking for . . . ." (Defs.' Reply Br. 31.) This satisfies defendants' "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." See Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes, 32 F.3d at 759).

At the third step of the McDonnell Douglas framework, a plaintiff must show that the employer's proffered legitimate, nondiscriminatory reason for the adverse employment action is pretext for discrimination. Burdine, 450 U.S. at 252. To establish pretext, a plaintiff must present "some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). Because "the prima facie case and pretext inquiries often overlap," the Court may consider the same evidence at both stages of the McDonnell Douglas analysis. Doe v. C.A.R.S. Protection Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).

As evidence of pretext, plaintiff points to, inter alia, the fact that there was no formal documentation of plaintiff's alleged performance issues and that plaintiff was not given an opportunity to improve upon any alleged deficiencies before she was terminated. (See Pl.'s Opp'n Br. 87 n.8.) However, none of plaintiff's arguments account for the fact that there is no nexus between the termination decision and plaintiff's status as a woman. In this case, there is no evidence of "discriminatory comments by an executive connected with the decisionmaking process," Abrams v. Lightolier Inc., 50 F.3d 1204, 1215 (3d Cir. 1995), nor is there any evidence in the record linking the termination decision to plaintiff's status as a woman. Cf. Selvanathan v.

12

Opportunities Industrialization Centers Int'l, 871 F. Supp. 2d 349, 365 (E.D. Pa. 2012) (denying summary judgment where executive involved in termination decision "made comments tending to show that he was biased against Asian-Indians"). And even if defendants erred in assessing plaintiff's competencies to perform her job, a "wrong or mistaken" assessment is not sufficient to establish pretext. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999) ("the employer's articulated reason [must be] . . . so plainly wrong that it cannot have been the employer's real reason.") (internal quotations omitted).

On the present state of the record, a factfinder could not reasonably conclude that defendants' proffered reason for terminating plaintiff was pretext for sex discrimination. See Fuentes, 32 F.3d at 765 (the inquiry is not "whether the employer is wise, shrewd, prudent or competent" but rather "whether discriminatory animus motivated the employer"). The Court thus concludes that, even if plaintiff had established a prima facie case, defendants would still be entitled to summary judgment on this claim.

### 2) Retaliation Claim

Plaintiff next asserts that defendants retaliated against her for complaining about Mr. X's alleged sexual harassment. See 42 U.S.C. § 2000e-3(a) (making it unlawful for an employer to discriminate against an employee for opposing an employment practice made unlawful by Title VII). Plaintiff advances this claim in the context of defendants' failure to promote her to the position of Global HR VP and their eventual termination of her employment. The McDonnell Douglas burden-shifting analysis also applies to Title VII retaliation claims. Jalil v. Avdel Corp., 873 F.2d 701, 706–07 (3d Cir. 1989).

### a.  Prima Facie Case Under Title VII and the PHRA

To establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006) (citation omitted). Defendants do not challenge the evidence that plaintiff engaged in protected activity and that adverse employment actions were taken against her. Thus, the Court considers only whether there is sufficient evidence in the record of a causal connection between plaintiff's protected activity and the adverse employment actions.

With respect to the third element, a plaintiff must establish that his or her "protected activity was a but-for cause of the alleged adverse action by the employer." Blakney v. City of Philadelphia, 559 F. App'x 183, 185 (3d Cir. 2014) (citing Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013)). "[T]o demonstrate a causal link between [] protected activity and [an] adverse [employment] action [] . . . a plaintiff may rely on a 'broad array of evidence.'" Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007), as amended (Aug. 28, 2007) (citation omitted). "Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, . . . or other types of circumstantial evidence, such as inconsistent reasons given by the employer for terminating the employee or the employer's treatment of other employees, that give rise to an inference of causation when considered as a whole." Marra, 497 F.3d at 302 (citations omitted). The U.S. Court of Appeals for the Third Circuit has held that "a temporal proximity of two days is unusually suggestive of

causation, . . . but [] that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive." Blakney, 559 F. App'x at 186.

In this case, the temporal proximity between plaintiff's ethics complaint on January 31, 2011 and (a) the failure to promote her to the position of Global HR VP on May 12, 2011, and (b) her termination on December 12, 2011, is not "unusually suggestive of a causal connection." Marra, 497 F.3d at 302. Recognizing this, defendants argue that plaintiff has failed to produce additional evidence sufficient to establish a causal connection. The Court disagrees.

As circumstantial evidence of causation, plaintiff points to, inter alia, the fact that when Lawrence Miller received plaintiff's application for the Global HR VP position he asked Carrie Watt whether he should consider plaintiff's application "in light of her ethics complaint." (Pl.'s Opp'n Br. 40.) Plaintiff also points to a February 14, 2011 email sent to defendants by the outside law firm that was retained to investigate plaintiff's ethics complaint against Mr. X. (Id. 42.) The law firm's email referenced an email that plaintiff had sent to her supervisor, Tim Lipp, in which plaintiff complained that Lipp was unfairly criticizing and scrutinizing her as a result of her ethics complaint.[8] (Id. 16.) Plaintiff further highlights that Miller testified that even if he seriously considered plaintiff for the position, information he learned about the circumstances surrounding her ethics complaint would have "caused him umbrage." (Id.) Defendants offer a benign explanation in response, but a reasonable factfinder could credit plaintiff's version of the facts over defendants' version. See, e.g., McGuffey v. Brink's Inc., 558 F. Supp. 2d 565, 573 (E.D. Pa. 2008) (denying summary judgment where person who was "instrumental" in making adverse hiring decision knew about pending EEOC charge).

---

[8]     The law firm's email to defendants stated: "This causes my 'spider sense' to tingle. [Plaintiff's] message may be heartfelt and guileless, however, it also fits the mold [of] papering the file at the suggestion of a plaintiff's attorney. We may want to consider an appropriate written response. . . ." (Pl.'s Opp'n Br. 40.)

Similarly, with respect to her termination, plaintiff argues, <u>inter alia</u>, that circumstantial evidence of causation is established by the fact that Miller admits "that he told Manion about [p]laintiff's complaint so that she would be aware of it in connection with her plans for [restructuring the] HR [department], and . . . that Manion told [plaintiff] she would not consider her for her current job because of 'everything that happened with Vince' . . . ." (<u>Id.</u> 53.) Plaintiff further argues that, despite plaintiff's experience and qualifications, defendants considered her "for no job going forward in the organization, including the one she currently performed to [d]efendants' satisfaction." (<u>Id.</u> 57.)

Based on all of the evidence, the Court concludes that plaintiff has presented sufficient evidence of a causal link between her protected activity and the adverse employment actions taken against her. <u>Blakney</u>, 559 F. App'x at 185. Plaintiff has thus established a prima facie case of retaliation under Title VII and the PHRA.

### b.  Legitimate, Nondiscriminatory Reason

Defendants aver that plaintiff was not promoted to the position of Global HR VP because defendants strongly preferred to hire an outside candidate who had experience in international healthcare and emerging markets. (Defs.' Reply Br. 14.) Defendants further assert that plaintiff was terminated because the recently-hired Global HR VP, Melissa Manion, determined that plaintiff did not possess the requisite competencies to go forward in the restructured Human Resources department. (<u>Id.</u> 31.) This satisfies defendants' "relatively light" burden to "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision[s]." <u>See</u> <u>Tomasso</u>, 445 F.3d at 706 (citing <u>Fuentes</u>, 32 F.3d at 759).

16

### c.  Pretext

Plaintiff advances numerous arguments as evidence of pretext. Plaintiff argues that defendants have given different and contradictory explanations of why they failed to promote her to the position of Global HR VP. (Pl.'s Opp'n Br. 45.) According to plaintiff, defendants have asserted both that they did not consider plaintiff's application at all and that they did consider plaintiff's application but determined that she was not qualified for the job. See Keller, 130 F.3d at 1108 (a plaintiff can establish pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence"). Plaintiff further argues that her job performance leading up to her termination was satisfactory and that pretext is demonstrated by defendants' retention of less-qualified employees. Plaintiff also notes that the only two employees who were terminated, plaintiff and Ms. Y, had both complained of sexual harassment by male supervisors. (Id. 29–31, 65–70.) Based on all of the evidence presented, the Court concludes that plaintiff has demonstrated pretext. There are thus genuine disputes of material fact precluding the granting of the Motion for Summary Judgment on plaintiff's retaliation claim.

### 3)  Retaliatory Hostile Work Environment Claim

Plaintiff also asserts that defendants subjected her to a retaliatory hostile work environment because "she was a woman who opposed [d]efendants' sex discriminatory practices when she rejected Mr. X's sexual proposition in Las Vegas [in June 2010]." (Pl.'s Surreply Opp'n Defs.' Mot. Summ. J. 4.) The Third Circuit has recognized the cognizability of a retaliatory hostile work environment claim. Jensen v. Potter, 435 F.3d 444, 459 (3d Cir. 2006); Hare, 220 F. App'x at 134; see also Gowski v. Peake, 682 F.3d 1299, 1311 (11th Cir. 2012)

(collecting cases). Such a claim is based on the subjecting of an employee to a hostile work environment in retaliation for having engaged in protected activity. This differs from a traditional hostile work environment claim based on sexual harassment. A retaliatory hostile work environment claim is analytically distinct from a retaliation claim or a claim based on sex discrimination. See Jensen, 435 F.3d at 449.

Although the law in this area is unsettled in the Third Circuit,[9] the Court adopts the view that in order to establish a retaliatory hostile work environment claim, plaintiff must prove that: (1) she suffered intentional discrimination because of her protected activity; (2) the discrimination was severe or pervasive;[10] (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; (5) she suffered materially adverse action or actions in relation to the hostile work environment; and (6) a basis for employer liability is present. See Komis v. Perez, No. 11-6393, 2014 WL 3437658, at *1 (E.D. Pa. July 15, 2014) (citing Jensen, 435 F.3d at 444).

---

[9]     See Komis v. Perez, No. 11-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014) (noting that "the law is unclear concerning the proper standard for retaliatory hostile work environment claims, as opposed to direct retaliation claims" but requiring a plaintiff to show "severe or pervasive" harassment in addition to "materially adverse" action).

[10]     Plaintiff argues that after Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006), a plaintiff asserting a hostile work environment claim based on retaliatory harassment need not demonstrate "severe or pervasive" discrimination. (Pl.'s Opp'n Br. 88 n.9). The Court rejects this argument. Burlington Northern involved a direct retaliation claim and nothing in that decision demonstrates an intent to alter the "severe or pervasive" standard in the context of a retaliatory hostile work environment claim. Moreover, allowing a hostile work environment claim to proceed in the absence of severe or pervasive discrimination would be inconsistent with the purposes of Title VII, which is not intended to be a "general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80–81 (1998); see also Komis, 2014 WL 3437658, at *1–3; Culler v. Sec'y of U.S. Veterans Affairs, 507 F. App'x 246, 249 (3d Cir. 2012) (noting that "[t]o prevail on a hostile work environment claim, a plaintiff must show that his workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment'") (citation omitted).

Defendants argue first that plaintiff's claim is untimely under both Title VII and the

PHRA because the last act of alleged sexual harassment by Mr. X occurred on November 24,

2010, which is before the February 26, 2011 cut-off date for plaintiff's Title VII claims and

before the June 26, 2011 cut-off date for plaintiff's PHRA claims.[11] The Court disagrees. In Nat'l

R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002), the Supreme Court of the United

States held that although Title VII "precludes recovery for discrete acts of discrimination or

retaliation that occur outside the statutory time period[,] . . . consideration of the entire scope of a

hostile work environment claim, including behavior alleged outside the statutory time period, is

permissible for the purposes of assessing liability, so long as an act contributing to that hostile

environment takes place within the statutory time period."

In this case, plaintiff alleges that the retaliatory conduct began on June 15, 2010 — the

day after she rejected Mr. X's alleged sexual proposition — when Mr. X and his subordinates,

including Tim Lipp, were unfairly critical of a presentation plaintiff gave to a group of human

resources professionals. (Pl.'s Opp'n Br. 92–94.) Thereafter, plaintiff alleges that she was

continually subjected to a pattern of retaliatory conduct, which culminated in her termination in

December 2011. (Id.) At least one of those alleged retaliatory acts — plaintiff alleges that her

supervisor, Tim Lipp, unfairly scrutinized her expense reimbursement requests on June 27, 2011

---

[11]     Plaintiff filed her EEOC charge, which was dual-filed with the Pennsylvania Human
Relations Commission, on December 23, 2012. Accordingly, the statute of limitations is 300
days from that date for plaintiff's Title VII claims and 180 days for plaintiff's PHRA claims.

— falls within the relevant statutory time periods of Title VII and the PHRA.[12] Accordingly,

plaintiff's hostile work environment claim is not time-barred because "all acts which constitute

the claim are part of the same [allegedly] unlawful employment practice and at least one act falls

within the [statutory] time period." Morgan, 536 U.S. at 122.[13]

Defendants further argue that plaintiff's claim fails on the merits because plaintiff cannot

establish that a basis for employer liability is present. (See Defs.' Mem. Law 41–65; Defs.'

Reply Br. 2–9.) The Court also rejects this argument. An employer's liability for harassment

depends, in part, on the status of the alleged harasser. Burlington Indus., Inc. v. Ellerth, 524 U.S.

742, 765 (1998). An employer is strictly liable if the alleged harasser is "a supervisor with

immediate (or successively higher) authority over the employee" and the harassment results in a

"tangible employment action." Id.  A tangible employment action occurs when there is "a

significant change in employment status, such as discharge, demotion, or undesirable

reassignment." Id. "When no tangible employment action is taken, a defending employer may

raise an affirmative defense to liability or damages, . . . [which] comprises two necessary

elements: (a) that the employer exercised reasonable care to prevent and correct promptly any

---

[12]     The fact that this allegedly retaliatory act is of a non-sexual nature is not fatal to
plaintiff's claim. Defendants' arguments to the contrary are rooted in a misapprehension of the
nature of plaintiff's claim. Plaintiff does not argue that she was subjected to a hostile work
environment as a result of sexual harassment; she argues instead that she was subjected to a
hostile work environment because she engaged in protected activity under Title VII and the
PHRA.

[13]     The Court also rejects defendants' argument that its internal investigation of plaintiff's
ethics complaint constituted an intervening action that severed the link between the timely and
untimely conduct in this case. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 119
(2002) ("[I]f an act on day 401 had no relation to the acts between days 1–100, or for some other
reason, such as certain intervening action by the employer, was no longer part of the same hostile
environment claim, then the employee cannot recover for the previous acts, at least not by
reference to the day 401 act."). Even if defendants' investigation caused Mr. X to resign, which
plaintiff disputes, the alleged retaliatory conduct did not stop when Mr. X left Teleflex; plaintiff
alleges that persons other than Mr. X continued to retaliate against her until she was terminated.

sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

Plaintiff has alleged a pattern of retaliatory conduct perpetrated in part by her supervisors and culminating in her termination from employment. If plaintiff successfully proves at trial all of the other required elements of a retaliatory hostile work environment claim, defendants would therefore be held strictly liable. Assuming arguendo that there was no tangible employment action taken by a supervisor, there are genuine disputes of material fact with respect to defendants' affirmative defense. On the present state of the record, a jury could determine, as defendants argue, that they acted promptly in addressing plaintiff's complaint and that plaintiff unreasonably delayed in making a formal complaint about Mr. X's alleged sexual harassment; however, a jury could also determine that after Mr. X resigned, plaintiff continued to be harassed in retaliation for having made a complaint and that it was reasonable for plaintiff to have waited as long as she did in reporting Mr. X's conduct. (Pl.'s Opp'n Br. 97.) In light of the conflicting evidence in the record, whether defendants have proved their affirmative defense is a question best left for the jury to decide.

In sum, the Court concludes that plaintiff's retaliatory hostile work environment claim is not time-barred and that there are genuine disputes of material fact as to employer liability on this issue. Accordingly, defendants' Motion for Summary Judgment is denied as to this claim.

## IV.    PLAINTIFF'S MOTIONS TO EXCLUDE EXPERT TESTIMONY

The Court next considers plaintiff's three Motions to exclude expert testimony. Specifically, plaintiff seeks to strike the reports of and to exclude the proffered expert testimony

of Dr. Jon Younger, Dr. Charles Sodikoff, and the Center for Forensic Economic Studies. After

setting out the appropriate legal standard, the Court considers each of plaintiff's Motions in turn.

### A. Legal Standard

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

The "pathmarking" Supreme Court cases interpreting Rule 702 are Daubert v. Merrell Dow

Pharm., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  United

States v. Mitchell, 365 F.3d 215, 234 (3d Cir. 2004). In Daubert, the Supreme Court held that

"[f]aced with a proffer of expert scientific testimony . . . the trial judge must determine at the

outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist

the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 592. In Kumho

Tire, the Supreme Court made clear that the Daubert gatekeeping function extends beyond

scientific testimony to testimony based on "technical" and "other specialized" knowledge. 526

U.S. at 141.

Under Daubert, courts must address a "trilogy of restrictions" before permitting the

admission of expert testimony: qualification, reliability and fit. Schneider v. Fried, 320 F.3d 396,

404 (3d Cir. 2003); see also Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000). The party

offering the expert must prove each of these requirements by a preponderance of the evidence.

In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

### 1) Qualification

To qualify as an expert, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325, 335 (3d Cir. 2002) (quoting Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. See Waldorf, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 855 (3d Cir. 1990) (quoting Fed. R. Evid. 702) ("Paoli I").

Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." Id. (quoting Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996)).

### 2) Reliability

The reliability requirement of Daubert "means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994) ("Paoli II") (quoting Daubert, 509 U.S. at 590). In Kumho Tire, the Supreme Court held that the Daubert test of reliability is "flexible" and that "the law grants a district court the same broad latitude when it decides how to determine reliability as

it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141-42 (emphasis

omitted). In determining whether the reliability requirement is met, courts examine the following

factors where appropriate:

> (1) whether a method consists of a testable hypothesis; (2) whether the method
> has been subject to peer review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's operation; (5)
> whether the method is generally accepted; (6) the relationship of the technique to
> methods which have been established to be reliable; (7) the qualifications of the
> expert witness testifying based on the methodology; and (8) the non-judicial uses
> to which the method has been put.

Mitchell, 365 F.3d at 235 (citing Paoli II, 35 F.3d at 742 n.8). These factors are neither

exhaustive nor applicable in every case. Kannankeril v. Terminix Int'l Inc., 128 F.3d 802, 806-07

(3d Cir. 1997).

Under the Daubert reliability prong, parties "do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are correct, they only have to

demonstrate by a preponderance of evidence that their opinions are reliable." Paoli II, 35 F.3d at

744 (emphasis omitted). "The evidentiary requirement of reliability is lower than the merits

standard of correctness." Id. "As long as an expert's scientific testimony rests upon 'good

grounds, based on what is known,' it should be tested by the adversary process – competing

expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for

fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Mitchell,

365 F.3d at 244 (quoting Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 85

(1st Cir. 1998)).

### 3) Fit

For expert testimony to meet the Daubert "fit" requirement, it must "assist the trier of fact

to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "This condition

goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert, 509 U.S. at 591 (citations and internal quotation marks omitted). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." Id.

### B.  Discussion

#### 1)  Motion to Exclude Dr. Younger's Testimony

Plaintiff first seeks to exclude the expert testimony of plaintiff's proposed expert, Dr. Jon Younger. Dr. Younger has provided opinions regarding the ranking process Melissa Manion used in determining that plaintiff should not be retained in the restructured Human Resources department. First, Dr. Younger opines that Manion "took the appropriate and necessary steps" to define the business needs of the Human Resources department and to establish criteria "consistent with her view of the challenges facing the business." (Defs.' Mem. Law. Opp'n Pl.'s Mot. Strike Report and Preclude Proposed Expert Test. of Dr. Jon Younger 15.) Next, Dr. Younger opines that Manion designed an organizational structure consistent with various research materials in the field of Human Resources management. (Id.) Finally, Dr. Younger opines that Manion's conduct in evaluating the performance and competencies of current Human Resources employees was consistent with those same research materials. (Id.) Overall, Dr. Younger concludes that, in restructuring the Human Resources department, "Ms. Manion used a process that was consistent with the research-based models for value based human resource management." (Id.)

Plaintiff does not challenge Dr. Younger's qualifications. Instead, plaintiff argues that Dr. Younger's opinions are irrelevant and will not assist the trier of fact, i.e. that his opinions do not "fit" the facts of this case, and that his report sets forth no methodology and is thus unreliable.

(Br. Supp. Pl.'s Mot. Strike Report and Preclude Expert Test. of Dr. Jon Younger 4–8.) The Court rejects these arguments.

With respect to fit, the proposed testimony of Dr. Younger is relevant to a determination of defendants' motivation in terminating plaintiff's employment — an issue which is squarely in dispute in this case — and it would assist the trier of fact in deciding between plaintiff's and defendants' competing theories about the validity of the reorganization process utilized by defendants. See, e.g., Maharaj v. California Bank & Trust, 288 F.R.D. 458, 460 (E.D. Cal. 2013) (noting that "courts commonly permit human resources experts to testify on human resources management policies and practices and whether an employer deviated from those policies and practices") (citation omitted).

With respect to reliability, contrary to plaintiff's assertion, Dr. Younger did apply a particular methodology in rendering his opinions. Rather than relying merely on his "own intuition," Oddi v. Ford Motor Co., 234 F.3d 136, 158 (3d Cir. 2000), Dr. Younger's opinions are based on his review of the relevant parts of the record, his professional background and experience, and his review of various research materials in the field of human resources management, some of which he himself authored. Thus, the Court concludes that Dr. Younger's opinions rest upon "good grounds," Mitchell, 365 F.3d at 244, and that defendants have "come

forward with proof of a valid methodology based on more than just the <u>ipse dixit</u> of the expert." <u>Pappas v. Sony Elecs., Inc.</u>, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000).[14]

In sum, Dr. Younger's testimony is relevant, it will assist the trier of fact in weighing plaintiff's and defendants' competing explanations for plaintiff's termination, and his opinions are reliable. Accordingly, the Court denies plaintiff's Motion to Exclude Dr. Younger's Testimony.

### 2)   Motion to Exclude Dr. Sodikoff's Testimony

Plaintiff next challenges the proposed expert testimony of Dr. Charles Sodikoff. Dr. Sodikoff has provided opinions regarding plaintiff's job search efforts after her employment with defendants was terminated. Specifically, Dr. Sodikoff opines that: (1) plaintiff has not conducted a "reasonable and diligent job search to mitigate her loss by finding comparable employment . . . ."; (2) if plaintiff had conducted a "reasonable and diligent job search . . . she would have found a comparable position within 4–12 months"; (3) if plaintiff conducts a "reasonable and diligent" job search, she will be able to fully mitigate her loss by establishing her own consulting practice; and (4) plaintiff's documentation shows that she is no longer looking for a permanent, full-time position or additional consulting work. Defendants' purpose in providing Dr. Sodikoff's testimony is to carry their burden of proving that plaintiff failed to mitigate her damages. <u>Caufield v. Ctr. Area Sch. Dist.</u>, 133 F. App'x 4, 10 (3d Cir. 2005) (citing

---

[14]      The fact that Dr. Younger acknowledged in his deposition that the process Manion used could have been used to effect a retaliatory bias does not render his opinions unreliable or unhelpful to the trier of fact. Plaintiff may bring this out on cross-examination, and the trier of fact can then decide whether to credit defendants' version of the facts regarding the motivation behind plaintiff's termination. <u>See, e.g.</u>, <u>United States v. Mitchell</u>, 365 F.3d 215, 244 (3d Cir. 2004) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.").

Robinson v. Southeastern Pa. Transp. Auth., Red Arrow Div., 982 F.2d 892, 897 (3d Cir. 1993)).

In order to succeed, defendants must show either that: (1) plaintiff failed to use reasonable

diligence in securing substantially equivalent positions that were available to her, or (2) that

plaintiff withdrew entirely from the job market. Id. For the reasons that follow, the Court

concludes that all four of Dr. Sodikoff's opinions are inadmissible under Rule 702.

### a.   Dr. Sodikoff's First Opinion

First, plaintiff argues that it would be improper for Dr. Sodikoff to testify as to whether

plaintiff has conducted a "reasonable and diligent job search" following her termination. The

Court agrees. Allowing Dr. Sodikoff to opine that plaintiff did not use reasonable efforts in

searching for other employment would improperly substitute Dr. Sodikoff's judgment for that of

the trier of fact. See Roniger v. McCall, No. 97-8009, 2000 WL 1191078, at *5 (S.D.N.Y. Aug.

22, 2000) ("It would not be proper for Sodikoff to testify as to whether Roniger's efforts to find

comparable employment were 'reasonable' because this is an ultimate question in this case

which is for the jury to decide based on all the evidence and this Court's instructions.") (citations

omitted); Castelluccio v. Int'l Bus. Machines Corp., No. 09-CV-1145, 2012 WL 5408420, at *3

(D. Conn. Nov. 6, 2012) (same). Thus, Dr. Sodikoff will not be permitted to opine that plaintiff

did not conduct a "reasonable and diligent" job search.

However, as in Roniger and Castelluccio, Dr. Sodikoff will be permitted to testify as to

plaintiff's job search "to the extent that his testimony offers information that is relevant to the

issue of [plaintiff's] mitigation and that lies outside the knowledge of a layperson." Castelluccio,

2012 WL 5408420, at *3; see also Roniger, 2000 WL 1191078, at *5. Such testimony may

include "the nature and degree of efforts which typify an average or successful job

search[] . . . and how [plaintiff's] efforts compare to what are typical — or successful — efforts."
<u>Id.</u>

### b.  Dr. Sodikoff's Second Opinion

Next, plaintiff argues that Dr. Sodikoff's second opinion — that plaintiff could have found comparable work within 4–12 months — is unreliable under <u>Daubert</u>. The Court agrees. In order for Dr. Sodikoff's opinion to be reliable, the information he relied on must be pertinent to plaintiff's field, Human Resources. <u>Castelluccio</u>, 2012 WL 5408420, at *4. The Court concludes that Dr. Sodikoff did not rely on such information in this case. In forming his opinion, Dr. Sodikoff relied in part on unemployment statistics from the United States Department of Labor's Bureau of Labor Statistics concerning "Management, Professional, and Related Operations." In <u>Castelluccio</u>, Dr. Sodikoff relied on these same statistics, but acknowledged in that case that this occupational category does not "differentiate between employees at different compensation rates" and "that it was certainly possible that the Management, Professional[,] and Related Occupations category would lump together, for example, a 65,000 a year dental hygienist with a CEO of a Fortune 500 or 100 company making 20 or 30 times that compensation[.]" <u>Id.</u> (internal quotation marks omitted). As in <u>Castelluccio</u>, the Court concludes that "the statistical data Dr. Sodikoff relied upon to form his opinion as to when [plaintiff] should have found comparable employment [is] not sufficiently pertinent to [plaintiff's] field to be considered reliable." <u>Id.</u>

### c.  Dr. Sodikoff's Third Opinion

Plaintiff next argues that Dr. Sodikoff's third opinion — if plaintiff conducts a "reasonable and diligent" job search, she can fully mitigate her loss by establishing her own consulting practice — does not pass muster under Rule 702. The Court agrees. The Court has already ruled that Dr. Sodikoff will not be permitted to testify as to whether plaintiff conducted a

"reasonable and diligent" job search. To the extent that Dr. Sodikoff's third opinion relies on his own determination of what constitutes a "reasonable and diligent" job search, it is inadmissible.

Moreover, the Court concludes that Dr. Sodikoff's opinion does not rest upon "good grounds." Mitchell, 365 F.3d at 244. In support of his conclusion, Dr. Sodikoff states that "given [plaintiff's] credentials and experience, she might be able to negotiate fees at a higher rate than $75.00 per hour." This is based in part on his review of a website showing that Human Resources consultant fees generally range from $200 to $800 per hour. However, Dr. Sodikoff does not otherwise provide a sufficient explanation for how this translates to plaintiff being able to "fully mitigate her loss by establishing her own consulting practice." There is simply "too great an analytical gap between the data and the opinion proffered for the opinion to be reliable." Roniger, 2000 WL 1191078, at *4. The Court further concludes that Dr. Sodikoff's opinion also does not "fit" the facts of this case, i.e. it will not "assist the trier of fact to understand the evidence or to determine a fact in issue," because it is too speculative. Fed. R. Evid. 702; see Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 670–71 (6th Cir. 2010) (trier of fact will not be assisted by an expert opinion that is overly speculative or hedged).

### d.  Dr. Sodikoff's Fourth Opinion

Lastly, plaintiff argues that Dr. Sodikoff's fourth opinion — that plaintiff withdrew entirely from the job market — is not admissible under Rule 702 because "[t]here is no particular scientific, technical[,] or specialized knowledge to seeking employment that is outside of the

jurors' ken."[15] (Br. Supp. Pl.'s Mot. Strike Report and Preclude Proposed Expert Test. of Dr.

Charles Sodikoff 4.) The Court agrees. Whether plaintiff has completely withdrawn from the

employment market is not a matter of specialized knowledge that lends itself to expert testimony

under Rule 702. The trier of fact can readily determine for itself whether plaintiff completely

withdrew from the job market based on the evidence presented at trial.

In sum, the proposed testimony of Dr. Sodikoff relating to the four challenged opinions

does not pass muster under Daubert and Rule 702.[16] Dr. Sodikoff will not be permitted to testify

to such opinions at trial. Subject to plaintiff's right to object to inadmissible evidence, Dr.

Sodikoff will be permitted to testify as to other matters at trial "to the extent that his testimony

offers information that is relevant to the issue of [plaintiff's] mitigation and that lies outside the

knowledge of a layperson." Castelluccio, 2012 WL 5408420, at *3. Accordingly, plaintiff's

Motion to Exclude the Testimony of Dr. Sodikoff is granted in part and denied in part.

### 3) Motion to Exclude Center for Forensic Economic Studies Testimony

Finally, plaintiff challenges the proposed expert testimony from a representative of the

Center for Forensic Economic Studies to the extent that the testimony relies on those opinions of

Dr. Sodikoff that have been excluded. Because the Court has concluded above that the four

challenged opinions of Dr. Sodikoff fail to satisfy Daubert and Rule 702, a representative from

---

[15]     Plaintiff also argues that Dr. Sodikoff's other three opinions are excludable on this
ground, but this argument is unavailing. Although many jurors are likely to have some
experience with job searching, it does not follow that what constitutes "reasonable diligence" in
searching for employment is common knowledge. See Gabel v. Richards Spears Kibbe & Orbe,
LLP, No. 07-11031, 2009 WL 1856631, at *4 (S.D.N.Y. June 26, 2009) ("An ordinary lay
person would not necessarily be informed about what a successful job search consists of."). It
would therefore be appropriate for defendants to present expert testimony on what they contend
constitutes "reasonable diligence" in searching for employment.

[16]     The Court did not rely on any of these opinions in its consideration of defendants'
Motion for Summary Judgment.

the Center for Forensic Economic Studies will not be permitted to rely on those opinions in her testimony. See In re TMI Litig., 193 F.3d at 697 ("If the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded . . . Rule 703's reliability standard is similar to Rule 702's reliability requirement, i.e., 'there must be good grounds on which to find the data reliable.'") (citation omitted). Accordingly, plaintiff's Motion to Exclude Center for Forensic Economic Studies Testimony is granted.

## V.     CONCLUSION

For the reasons set forth above, that part of defendants' Motion for Summary Judgment seeking dismissal of plaintiff's claim of sex discrimination based on her termination and dismissal of plaintiff's claims of demotion and failure to promote as discrete acts under Title VII and the PHRA is granted. Defendants' Motion for Summary Judgment is denied in all other respects.

With respect to plaintiff's three Motions to exclude expert testimony: (1) Plaintiff's Motion to Exclude Dr. Younger's Testimony is denied; (2) plaintiff's Motion to Exclude Dr. Sodikoff's Testimony is granted to the extent that it seeks to exclude Dr. Sodikoff's four challenged opinions. Dr. Sodikoff will, however, be permitted to testify at trial, subject to plaintiff's right to object to inadmissible evidence, as to other matters to the extent that his testimony offers information that is relevant to the issue of plaintiff's mitigation and that lies outside the knowledge of a layperson; and (3) plaintiff's Motion to Exclude Center for Forensic Economic Studies Testimony is granted.

An appropriate order follows.